# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| KIMBERLY R. SHACKLEFORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:10CV2175 AGF |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for judicial review of the final decision of the

Commissioner of Social Security finding that Plaintiff Kimberly R. Shackleford, was not

disabled and, thus, not entitled to disability insurance benefits or to supplemental security

income ("SSI"), under Titles II and XVI of the Social Security Act, respectively, 42

U.S.C. §§401-434 and §§1381-1383(f). For the reasons set forth below, the decision of

the Commissioner shall be affirmed.

Plaintiff, who was born on April 25, 1968, filed her applications for benefits on

April 9, 2009, at the age of 40, alleging a disability onset date of November 1, 2008, due

to obesity, degenerative joint disease in her lower back and arthritis in her left knee.

After Plaintiff's application was denied at the initial administrative level, Plaintiff

requested a hearing before an Administrative Law Judge ("ALJ") and a hearing, at which

Plaintiff was represented by counsel, was held on March 24, 2010. Plaintiff and a

vocational expert ("VE") testified at the hearing.  By decision dated May 13, 2010, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform certain jobs identified by the VE.  Plaintiff's request for review by the Appeals Council of the Social Security Administration was denied on October 14, 2010.  Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

On review, Plaintiff asserts the ALJ's decision is not supported by substantial evidence on the record as a whole. Specifically, Plaintiff argues that the ALJ failed to assign proper weight to the medical opinion of Plaintiff's treating physician, Michael Spezia, D.O., and that the ALJ's RFC determination was not supported by medical evidence.  Plaintiff further asserts that the VE's testimony was therefore based on a flawed RFC and was insufficient to support the ALJ's decision.  In the alternative, Plaintiff argues that, regardless of the accuracy of the RFC determination, the VE's opinion conflicts with Social Security Policy, because the hypothetical question posed to the VE failed to state with sufficient specificity how frequently Plaintiff would need to change positions.  Further, Plaintiff objects to the VE's assessment regarding her inability to stoop, contending that it conflicts with Social Security Ruling ("SSR") 96-9p.  Plaintiff asks that the Court reverse the decision of the ALJ and enter judgment for Plaintiff.

**<u>BACKGROUND</u>**

**<u>Work History and Application Forms</u>**

Plaintiff's earnings records show she earned $234.30 in 1986, and had no earnings or earnings less than $11.00 total in years 1987-1996. Plaintiff earned between approximately $73.00 to $1,800 during 1997-2007, with high salaries of $1792.43 in 1997 and $1,138.25 in 2003, and a low of $72.74 in 1998, and no earnings in 2002 and 2004-2006. (Tr. 93.) In the undated Disability Report – Adult, completed upon her application for benefits, Plaintiff stated that she had stopped working for non-medical reasons on July 31, 2008. She stated that arthritis in her lumbar spine and left knee first interefered with her ability to work in August, 2008, that she became unable to work on November 1, 2008, and had not worked since the conditions first interfered with her ability to work.

Plaintiff had worked as a laborer, through a temp service, four hours a day for four days a week in 1999-2000, as a full-time nurse aide from 1997-2003, and as a short-order cook from June to July, 2008. Plaintiff stated that she was 5'7" tall, and weighted 270 pounds. She received care from her primary care physician for back pain. She reported taking the following medications: "sulfameth, methocarbonal, meloxicam, tramadol and terbinafine,"[1] and stated that her medications caused drowsiness and sleepiness. (Tr.

---

[1] In Disability Report-Appeals, update 2/11/10, Plaintiff reported the following medications: Trianterene, for high blood pressure; methocarbanol, a muscle relxant (2250 mg per day); and Ibuprofen (2400 mg per day); Naproxen (1000 mg per day) and Propoxyphene/APAP (100 mg as needed) for pain.

126.)  She further reported that an MRI scan of her knees and feet had been performed in

November 2008.  Additionally, in the Function Report – Adult, completed May 2, 2009,

Plaintiff reported that she cared for her six children, including cooking, cleaning and

bathing.  She reported that she cooked complete meals, with several courses, but since the

onset of her condition, she had to sit down frequently while cooking.  She could clean,

sweep, mop, and do laundry, but these tasks would sometimes take her all day because

her back pain required her to sit down constantly.  She stated she could only lift about 50

pounds, could not bend down and touch her toes, stand for more than five minutes, walk

a block or go up and down stairs very much.  Plaintiff reported she talked on the phone a

lot, had company over to play cards or talk, and went to movies.  She did not go out with

family and friends much anymore unless they went somewhere she could sit.  Plaintiff

indicated she used a wheelchair when in stores.  (Tr. 110-27.)

 **Medical Record**

    Michael Spezia, D.O., treated Plaintiff from October 2, 2002 through at least

October 2, 2010, for, among other conditions, back and knee pain.  The records provided

covered only 5/1/08 through 2/3/10.  Plaintiff saw Dr. Spezia three times between May

and October 2008 and six times between January and October 2009.  (Tr. 157, 162-63,

165-66, 190, 212-13, 219, 224.)

    On January 29, 2009, Plaintiff had an MRI performed on her lumbar spine due to

indications of low back pain and lumbar disc degeneration.  The MRI revealed facet

arthropathy bilaterally without significant stenosis in L4-L5 and L3-L4, reporting "no significant central canal, lateral recess, or neural foraminal stenosis is seen at any level of the lumbar spine." (Tr. 193.) Dr. Spezia treated Plaintiff for pain with medications including Ibuprofen, Naproxen, Darvocet, Tramadol, Robaxin and Norflex, which Plaintiff repeatedly reported were ineffective in treating her pain. Dr. Spezia referred Plaintiff to the Washington University Physicians Division of Pain Management, but she was not treated there due to a lengthy waiting list. (Tr. 151-53, 159-60, 162-63, 165-66, 190, 211, 219, 224.)

On May 7, 2009, Dr. Spezia completed a Medical Source Statement answering questions about Plaintiff's allegations of arthritis in the lumbar spine and the left knee. The form is largely illegible. Regarding Plaintiff's ability to perform work-related functions, Dr. Spezia noted "unable to do" followed by seven illegible words. The form also indicates that Dr. Spezia first saw Plaintiff on October 2, 2002, and last saw her on January 6, 2009. (Tr. 157-158.)

On June 10, 2009, Elbert Cason, M.D., saw Plaintiff for a consultative evaluation. Dr. Cason found no paravertebral muscle spasm, but did note tenderness in the paravertebral lumbar area. Plaintiff's straight leg raises were ninety degrees on the right, and sixty degrees on the left, with left knee pain. Plaintiff could squat by holding onto the edge of a desk and touch her toes with knees straightened. Dr. Cason's examination also revealed significant reduction in range of motion of the knees and elbows. A June

10, 2009 x-ray of Plaintiff's left knee showed medial compartment osteoarthritis.[2]  Dr.

Cason diagnosed Plaintiff with morbid obesity and arthritis in the lumbar spine and left

knee.  (Tr. 172-178.)

Also on June 10, 2009, Dr. Spezia completed a Medical Source Statement.  Dr.

Spezia's diagnoses of Plaintiff included lumbar facet arthropathy,[3] lumbar myositis,[4] class

III obesity and overactive bladder.  On the report, he circled that Plaintiff had full

capacity to sit one hour, stand thirty minutes, and walk thirty minutes during an eight-

hour workday, but that she could never stoop.  In checkbox format, Dr. Spezia indicated

that Plaintiff could only lift and/or carry twenty pounds occasionally and ten pounds

frequently.  He further indicated that Plaintiff had a medically determinable impairment

expected to produce pain with muscle spasm and reduced range of motion as objective

indicators of pain.  Dr. Spezia indicated Plaintiff's pain would preclude her from

persisting and focusing on simple tasks on a sustained, full-time work schedule, and that

---

[2]    Osteoarthritis is defined as erosion of articular cartilage resulting in pain and
loss of function, mainly affecting weight-bearing joints. Osteoarthritis is synonymous
with degenerative arthritis or degenerative joint disease. Stedman's Medical Dictionary,
(28th ed. 2006), 1388.

[3] Facet arthropathy is "degenerative disease of the posterior articular process of the
vertebrae." Jensen, M.C., et al., Magnetic Resonance Imaging of the Lumbar Spine in
People without Back Pain, *N Eng J Med*, 1994; 331:69-73.

[4]Myositis is an inflammation or swelling of the muscles which can be caused by
injury, infection, or an autoimmune disorder. Medline Plus (update date: 5/29/2009)
http://www.nlm.nih.gov/medlineplus/ency/article/001245.htm.

her diagnosed impairments would cause her to miss work twice a month and to be late or leave early twice a month if she attempted full-time work. Further, due to her impairments, Plaintiff would, during a normal eight-hour workday, need to take more than three breaks and lie down or take a nap. (Tr. 180-83.)

On June 15, 2009, Dr. Spezia completed a second Medical Source Statement in checkbox format. Dr. Spezia used a checkmark to indicate that in an 8-hour workday Plaintiff could stand and/or walk *with normal breaks* for at least two hours total, where she would stand and/or walk for fifteen minutes each hour in an eight hour work day. (emphasis added.) Dr. Spezia checked that Plaintiff needed to periodically alternate sitting and standing to relieve pain or discomfort. (Tr. 189.)

On June 22, 2009, Jennifer Held completed an Physical Residual Functional Capacity Assessment ("PRFCA") as a non-physician "single decisionmaker."[5] Ms. Held determined Plaintiff could lift and carry twenty pounds occasionally and ten pounds frequently. She stated Plaintiff could stand or walk at least two hours and sit about six hours in an eight-hour workday. Ms. Held determined Plaintiff's need to alternate between sitting and standing could be accommodated with normal breaks. The PRFCA also indicated that Plaintiff could occasionally climb ramps and stairs, balance, kneel, crouch and crawl; frequently stoop; and never climb ladders, ropes or scaffolds. No

---

[5]Single decision-makers are disability examiners authorized to adjudicate cases without mandatory concurrence by a physician. Social Security Advisory Board, Disability Decision Making: Data and Materials, May 2006, pp. 4, 104 n.7. at *http://www.ssab.gov/documents/chartbook.pdf.*

manipulative, visual, communicative or environmental limitations were established. (Tr. 204-10.)

After Ms. Held completed the PRFCA, Plaintiff visited Dr. Spezia on at least four additional occasions. On August 20, 2009 and February 3, 2010, Plaintiff complained to Dr. Spezia that she needed stronger pain medication for her arthritis. The other two visits seem unrelated to Plaintiff's relevant medical issues; however, the progress notes are largely illegible for all four visits. (Tr. 212-213, 219, 224.)

**Evidentiary Hearing on March 24, 2010** **(Tr. 18-33.)**

At the evidentiary hearing on March 24, 2010, Plaintiff testified she was forty-one years old, had an eleventh grade education, weighed 299 pounds and lived with her six children, ages eighteen, sixteen, fourteen, eleven, nine, and three. (Tr. 22-24.)

Plaintiff testified that she last worked in 2007 at St. Patrick's Center learning how to cook. Plaintiff also testified about a few other jobs and stated she realized she could no longer work due to daily back pain while employed at Family Dollar. Plaintiff testified that she thought her weight caused the pain, but after an MRI was performed, she was diagnosed with arthritis in her lumbar spine, explaining her daily pain. An x-ray also revealed arthritis in her left knee. (Tr. 23-24.)

When asked about her daily life, Plaintiff stated that she took care of her three-year-old. She testified that she cooked for her children, but standing at the stove for a long amount of time was painful. Because she could not stand for a long time, Plaintiff testified she would have to sit in a chair by the stove as she cooked bacon, a hamburger,

or something similar. Plaintiff also testified that she could walk up and down stairs to wash clothes, but would have to sit before climbing the stairs. Plaintiff stated she did household chores all day long. (Tr. 24.)

Plaintiff further testified she could not walk a full block before sitting down and that when she wants to take her son for a walk, she must walk along a route where she knows there are benches so that she can sit. Plaintiff further testified that she could walk about a block and a half before the pain in her back would start to bother her and that she could stand about five to ten minutes at one time before needing to sit down. Plaintiff also testified that she could not sit for more than half an hour before getting "really stiff." (Tr. 24-25.)

When asked about lifting, Plaintiff had trouble quantifying the weight she could lift. She testified that she could not pick up her three-year-old due to back strain, stating he weighed "sixty, seventy some pounds." When the ALJ suggested "[t]hat's a big boy" for a three-year-old, Plaintiff stated several times she was unsure of his weight and guessed he might weigh fifty pounds "or something, I'm not for sure at all, Judge." The ALJ then asked Plaintiff whether she could pick up a gallon of milk and Plaintiff answered "yes." The ALJ then told her a gallon of milk weighed about ten pounds. Plaintiff replied she could pick up more than a gallon of milk. (Tr. 25-26.)

Plaintiff testified she was taking Naproxen, Ibuprofen 800's and other medications she could not pronounce. She testified multiple times that the medication prescribed did not work for the pain, stating "it's like I'm taking it to go to sleep." Plaintiff testified that

Dr. Spezia tried to get her to a "pain management person," but they did not accept her Medicaid or have room to see her. Plaintiff also testified that she did go to the "back breakthrough relief clinic," which requested she come three times a week for twelve weeks, but that she lacked transportation and could not afford the therapy.[6] (Tr. 26-28.)

Plaintiff further testified that her pain affected her daily life and her children. She could not walk alone with her children to the bus stop or go to their school as she used to because of back and knee pain. (Tr. 27-28.)

Upon questioning by her attorney, Plaintiff clarified that, while working at St. Patrick's Center, she was in an educational vocational rehabilitation program at McMurphy's Grill. Plaintiff also testified that she had an overactive bladder, for which she was currently taking medicine. Plaintiff further testified that if she sat too long, she would get stiff in her legs and back. (Tr. 28-29.)

Plaintiff testified that when she would take her pain medication she would typically be tired all day, and might sleep for less than a half an hour. Plaintiff testified that she would take her medication if she woke up with back pain or if she knew she had to walk somewhere. Plaintiff woke up every morning to help her children get ready for school. Plaintiff further testified that she would not go to sleep during the day unless she took her pain medication. When that happened, Plaintiff would have to make her three-year-old take a nap with her so he would not be alone as she slept. (Tr. 29-30.)

---

[6] It is unclear from Plaintiff's testimony whether she returned at all to the relief clinic. (Tr. 27-28).

The ALJ asked the VE to consider a hypothetical forty-one year old individual with an eleventh grade education and no past relevant work who is limited to performing sedentary exertion level work. The ALJ further specified that the individual could occasionally climb stairs and ramps, never climb ropes, ladders or scaffolds, could frequently balance but only occasionally stoop, kneel, crouch or crawl, and should avoid concentrated exposure to unprotected heights, excessive vibration and hazardous machinery. The VE testified that such an individual could work on a cosmetic assembly line, testing medical supplies or as a table worker and that these jobs at the sedentary unskilled level existed in plentiful numbers both locally and nationally. (Tr. 30-31.)

The ALJ then asked the VE to consider a second hypothetical individual able to perform sedentary work which would allow the individual to rotate positions frequently, never climb stairs, ramps, ropes, ladders or scaffolds, occasionally balance, never stoop, occasionally kneel or crouch but never crawl. The ALJ further specified that the individual should again avoid concentrated exposure to unprotected heights, excessive vibration and hazardous machinery. The VE testified that he did not think this would change the available jobs cited in the first hypothetical. (Tr. 31.)

The ALJ then posed a third hypothetical, asking the VE to consider an individual with the same characteristics as noted in the second hypothetical with the added limitations: (1) any job must allow for occasional, unscheduled disruptions throughout the workday and work week secondary to the effects of medication, (2) the necessity to lie down for extended periods of time during the day, and (3) an inability to focus for the full

eight hours out of the day because of pain distraction, and "those kinds of things." The VE responded that there would be no jobs available locally or nationally for such an individual. (Tr. 31-32.)

**ALJ's Decision of May 13, 2010** **(Tr. 8-14)**

The ALJ found that Plaintiff had not engaged in substantial gainful activity since her application date, April 9, 2009. He further determined that Plaintiff had the severe impairments of obesity and degenerative joint disease of the lumbar spine and left knee, causing significant limitations in her ability to perform basic work activities. The ALJ found that none of Plaintiff's impairments alone or in combination met the requirements of a deemed-disabling impairment as listed in the Commissioner's regulations. (Tr. 10.)

The ALJ then determined that Plaintiff had the RFC to perform sedentary work, retaining the ability to lift and/or carry ten pounds occasionally and less than ten pounds frequently, to stand and/or walk for two out of eight hours, and to sit for six out of eight hours. The ALJ further determined that Plaintiff would need to "rotate positions frequently" and could not climb stairs, ramps, ropes, ladders or scaffolds, never stoop or crawl, occasionally balance, kneel, or crouch, and must avoid concentrated exposure to excessive vibration, hazardous machinery, or unprotected heights. (Tr. 10.)

The ALJ set forth the factors relevant to assessing a claimant's credibility, citing *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984). While acknowledging that the record contained objective evidence and imaging showing "degenerative joint disease of Plaintiff's lumbar spine and left knee" for which she had been treated, the ALJ

discredited Plaintiff's subjective assertions. The ALJ found Plaintiff's claim that she experienced constant pain interfering with her ability to work, perform household chores, and sleep inconsistent with the symptoms she reported in her application and in June 2009 when examined by Dr. Cason. The ALJ specifically noted that Plaintiff "reported at application and in June 2009 that she could lift 50 pounds; could sit all day; could stand only 30 minutes; and could walk one-half of a block. (Exhibit 3E; 3F). At hearing though, she testified that she can only lift a gallon of milk, sit for thirty minutes and stand for 5-10 minutes." The ALJ also noted that Plaintiff testified her medication made her sleep during the day, but had "rarely if ever" indicated side effects to Dr. Spezia and told the consultative examiner she did not sleep during the day. (Tr. 11-12.)

The ALJ further determined that, regardless of the inconsistencies in Plaintiff's testimony and reports of pain and restriction, "the record is devoid of any evidence showing a significant degree of muscle atrophy, paravertebral muscle spasm, sensory or motor loss, reflex abnormality, gait disturbance, or reduced range of motion of the spine or joints," and that Plaintiff had normal muscle strength throughout. The ALJ also considered a lack of necessity for medical treatment or assistive devices. He further determined that Plaintiff's obesity combined with her other impairments did not limit her beyond the RFC findings. (Tr. 11.)

In addition to discrediting Plaintiff's assertions, the ALJ gave little weight to Dr. Spezia's opinions, which indicated Plaintiff had limitations that would preclude the completion of an eight hour work day. Citing 20 CFR § 416.927(d) and SSR 96-9, the

13

ALJ acknowledged that a treating physician's medical opinion may be given controlling weight if it is well supported and not inconsistent with other substantial evidence in the record. The ALJ determined Dr. Spezia's opinions were not supported by treatment notes or by the results of clinical or diagnostic testing. (Tr. 12.)

Furthermore, the ALJ found Dr. Spezia's opinions inconsistent with the record as a whole because he assessed limitations worse than those claimed in Plaintiff's application, and also determined that Dr. Spezia's opinions were inconsistent with each other. The ALJ noted, "On June 10, 2009 [Dr. Spezia] indicated [Plaintiff] could only stand and walk for thirty minutes each out of an eight hour day; whereas on June 15, 2009 he indicated that [Plaintiff] could stand and/or walk for at least two hours of an eight hour day." The ALJ cited to exhibits 4F and 5F. The ALJ further indicated that "[t]he reports from Dr. Spezia are almost totally illegible, and contain few, if any, notations regarding any physical findings." The ALJ opined that Plaintiff saw Dr. Spezia on an irregular basis simply to complain of subjective pain and obtain medication.

The ALJ gave little weight to Dr. Spezia's opinion because Dr. Spezia's opinions were internally inconsistent; his notes were almost totally illegible containing few if any notations regarding physical findings; he had irregular contact with Plaintiff, limited to recording subjective complaints and updating medications; and Dr. Spezia's opinions indicated Plaintiff's limitations were more severe than her own allegations. The ALJ noted that Dr. Spezia did not submit any reports revealing "the type of significant clinical abnormalities one would expect if the [Plaintiff] were in fact disabled, and the doctor did

14

not specifically address this weakness." Considering the medical evidence in the record, the ALJ noted it was sparse, included minimal findings, and was devoid of the type of treatment indicative of disabling conditions. (Tr. 12-13.)

The ALJ further noted that Plaintiff's self-reported daily activities were inconsistent with total debilitation. Specifically, the ALJ found that Plaintiff

> resides with her six minor children who she takes care of, including making sure they get to school, cooking for them, bathing them; she is able to prepare complete meals; she performs household chores; she has no problems in handling her own personal care; she is able to drive, shop, spend time with others, play cards, go to the movies, maintain attention, follow instructions, and manage her own finances. [Plaintiff] testified that she spends her days cooking, cleaning, taking care of her kids, and washing laundry which involves going up and down the stairs.[7]

(Tr. 13.)

The ALJ also considered Plaintiff's work history, determining that, prior to the alleged disability onset date, she only worked sporadically with no substantial earnings. The record also failed to show Plaintiff left the work force due to her impairments, since Plaintiff stopped working as of July 31, 2008, for non-medical reasons, but claimed a disability onset date of November 1, 2008. The ALJ determined that this timing raised a question as to whether Plaintiff's continued unemployment was due to medical impairments or to Plaintiff's lack of motivation to work and cast doubt on her credibility. For these reasons, the ALJ found Plaintiff's descriptions of her symptoms and limitations

---

[7]The ALJ cited to Plaintiff's hearing testimony and exhibits 3E and 3D for these descriptions.

not fully persuasive or credible.  (Tr. 13.)

The ALJ concluded that Plaintiff's additional limitations did impede her ability to perform all or substantially all of the requirements of the unskilled sedentary level of work.  The ALJ thus asked the VE whether jobs exist in the national economy for an individual with Plaintiff's age, education, work experience, and residual functional capacity.[8]  The VE testified that jobs consistent with the specified limitations and at the sedentary unskilled level existed in plentiful numbers both locally and nationally, giving examples such as "assembler cosmetics," "packing medical supplies," and "table worker."  Pursuant to SSR 00-4p, the ALJ found these examples consistent with the Dictionary of Occupational Titles.  Based on the VE's testimony, the ALJ determined Plaintiff was capable of working and found her "not disabled" since April 9, 2009, the date of application.  (Tr. 13-14.)

## DISCUSSION

## Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court "must review the entire administrative record to 'determine whether the ALJ's findings are supported by substantial evidence on the record as a whole.'"  *Johnson v. Astrue*,  628 F.3d 991, 992 (8th Cir. 2011).  A court "may not reverse . . . merely because substantial evidence

---

[8]    The ALJ found that Plaintiff was forty years at the date of application, defining her as a younger individual age eighteen to forty-four, had no past relevant work, eliminating transferability of job skills as an issue, and a limited education with an ability to communicate in English.

would support a contrary outcome. *Id.* Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion." *Id.* (citations omitted); *see also Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (explaining that the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal by the reviewing court).

To be entitled to benefits, a claimant must demonstrate an inability to engage in substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted, or can be expected to last, for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) (citing *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007)); *see also* 20 C.F.R. § 404.1521(a). If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied.

If the impairment or combination of impairments is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's

impairment meets or is equal to one of the deemed-disabling impairments listed in the Commissioner's regulations. If not, the Commissioner asks at step four whether the claimant has the RFC to perform her past relevant work.

The RFC represents the most a claimant can do despite the combined effect of her credible limitations, and reflects her ability to perform work activity on a regular and continuing basis. *See* 20 C.F.R. § 416.945. The responsibility for assessing RFC lies with the ALJ, and the assessment should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" *Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)); 20 C.F.R. §§ 416.927(a), 416.946(c).

The medical opinion of a claimant's treating physician is entitled to substantial weight and may be accorded controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted); SSR 96-2p. By contrast, "[a] physician's statement that is not supported by diagnoses based on objective evidence will not support a finding of disability if the doctor's opinion is "inconsistent with, or contrary to the medical evidence as a whole, the ALJ can accord it less weight.." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (quotation omitted). An ALJ may discount a treating physician's opinion where other medical assessments are supported by better or more thorough medical

evidence, or where the treating physician renders inconsistent opinions that undermine his credibility. *Prosch v. Apfel*, 201 F.3d 1010, 1014 (8th Cir. 2000) (citations omitted).

In arriving at an RFC determination, an ALJ also must determine whether the claimant's statements describing her impairments are credible in light of several factors: the objective medical evidence; the claimant's prior work record; her daily activities; the duration, frequency, and intensity of her pain; precipitating and aggravating factors; dosage, effectiveness, and side effects of her medication; her functional restrictions; and any other evidence relating to her impairments. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). An ALJ may discount the claimant's subjective reports of pain and limitation as well as her statements regarding the severity and persistence of her alleged impairments on the basis of such factors. "If the ALJ discredits a claimant's credibility and gives a good reason for doing so, [the court] will defer to [his] judgment even if every factor is not discussed in depth." *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001). Furthermore, "the ALJ may properly discount the claimant's testimony where it is inconsistent with the record." *Teague v. Astrue*, 638 F. 3d 611, 615 (citing *Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004)).

If the ALJ determines that a claimant cannot perform her past relevant work, the burden of proof shifts to the Commissioner at step five to demonstrate that the claimant retains the RFC to perform work that is available in the national economy and that is consistent with the claimant's vocational factors. *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). The response of a vocational expert to a hypothetical question that

includes all of a claimant's impairments properly accepted as true by the ALJ constitutes substantial evidence to support a conclusion of no disability at step five. *Hunt v. Massanari*, 250 F.3d 622, 625 (8th Cir. 2001). However, a hypothetical question based upon a faulty RFC determination cannot generate an answer that constitutes substantial evidence. *Lauer v. Apfel*, 245 F.3d 700, 706 (8th Cir. 2001).

Independent of the claimant's burden at any step of the analysis, and regardless of whether the claimant is represented by counsel, the ALJ has an established duty to develop a full and fair record, because a hearing before an ALJ is deemed a non-adversarial proceeding. *Wilcutts v. Apfel*, 143 F.3d 1134, 1137-38 (8th Cir. 1998). When additional evidence might alter the outcome of a disability determination, the ALJ has a duty to elicit such evidence. *Id.* This duty may include seeking additional evidence or clarification from treating physicians if portions of the medical record that are crucial to the plaintiff's claim are illegible. *Snead v. Barnhart*, 360 F.3d 834, 838-39 (8th Cir. 2004). "[R]eversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial." *Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995)

**Weight Given to the Treating Physician's Opinion**

Plaintiff argues that the RFC determination is not supported by substantial evidence because the ALJ failed to give appropriate weight to the opinion of Dr. Spezia, the treating  physician. Specifically, she alleges that the ALJ, having found portions of Dr. Spezia's treatment notes illegible, failed to fulfill his obligation to fully develop the record by seeking clarification of the illegible entries. Plaintiff also asserts that the ALJ

should have afforded Dr. Spezia's opinions substantial, if not controlling weight, because they were well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence on the record.

The Court cannot agree that the ALJ failed to satisfy his obligation to develop a full and fair record or that he erred in failing to give substantial weight to Dr. Spezia's opinions. Although Dr. Spezia entered very few treatment notes with scant notations regarding physical findings, the record as a whole contains ample medical evidence to support the ALJ's determination. "[T]he claimant's failure to provide [legible] medical evidence . . . should not be held against the ALJ when there is medical evidence that supports the ALJ's decision." *Steed*, 524 F.3d at 876 (8th Cir. 2008) (citing *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005) (holding that an ALJ is not required to seek additional clarifying medical evidence unless a crucial issue is undeveloped)).

Here, the illegibility of the few notes that Dr. Spezia made was a minor concern in comparison to the paucity of his treatment notes. The ALJ gave little weight to Dr. Spezia's medical opinions, not because some of his notes were illegible, but because of the absence of physical findings and clinical or diagnostic testing in support of those opinions; the internal inconsistencies between the forms he completed related to Plaintiff's ability to perform work-related functions;[9] and the disparity between his

_____

[9]    On June 10, 2009, Dr. Spezia completed a check-box form indicating that Plaintiff was able to stand for thirty minutes and to walk for thirty minutes in an eight hour work day. Five days later, Dr. Spezia indicated, on another form, that Plaintiff could stand and/or walk *with normal breaks* for at least two hours total, where she would stand and/or walk for fifteen minutes each hour in an eight hour work day. The ALJ

opinions and the well developed, but contrary, medical evidence in the record as a whole.

The ALJ also found that Dr. Spezia had only irregular contact with Plaintiff, limited to recording subjective complaints and updating medications, and that Dr. Spezia failed to submit reports showing significant clinical abnormalities. In addition, although some of Dr. Spezia's notes are illegible, the checkbox and circle portions of the forms Dr. Spezia completed were legible and it is these portions of the record that were crucial to the Plaintiff's case. For these reasons, and regardless of the legibility of certain portions of Dr. Spezia's notes, the Court concludes that the ALJ had no obligation to clarify the illegible portions of Dr. Spezia's notes and properly discounted Dr. Spezia's medical opinions because they contained few physical findings and were inconsistent with one another and with the record as a whole. *Singh v. Apfel*, 222 F.3d at 452; *Steed v. Astrue*, 524 F.3d at 876.

**RFC Determination**

Plaintiff argues that the ALJ failed to provide a proper basis for his RFC determination. Specifically, Plaintiff asserts that the ALJ, after discrediting Dr. Spezia's opinions, improperly based his determination upon the examination and report of Dr. Cason the consultative medical source[10] examiner, ("medical examiner"). In addition, Plaintiff asserts that the ALJ improperly drew his own medical inferences from the

found these statements to be inconsistent with each other.

[10]    The Commissioner's regulations define acceptable medical opinions as being statements from "physicians and psychologists or other acceptable medical sources . . . ." 20 C.F.R. § 404.1527(a)(2).

record, and in particular, from the report of Jennifer Held, the non-medical consultant.

Although not generally considered substantial evidence of a claimant's abilities, the report of a medical examiner may be substituted for the opinion of a treating physician when the medical examiner's report is supported by better or more thorough medical evidence, or when the treating physician has rendered inconsistent opinions that undermine the credibility of those opinions. *See Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) (quoting *Prosch*, 201 F.3d at 1013); *Anderson v. Barnhart*, 344 F.3d 809, 812-13 (8th Cir. 2003) (citing *Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir. 2000)).

The Court finds that both conditions are met here. Dr. Cason performed a thorough examination and provided numerous physical findings in support of his opinion. In fact Dr. Cason's single report arguably provided more findings than Dr. Spezia did in the entirety of his treatment notes. *Compare* (Tr. 172-73, 175, 176, 177-78) *with* (Tr. 162-63, 165-66, 190, 195-96,198-99, 212-13, 219, 224.) Moreover, as noted by the ALJ, Dr. Spezia's opinions, despite being rendered within a few days of each other, were inconsistent with each other and with the record as a whole. (Tr. 12, 180-83, 189.) For these reasons, the Court concludes that Dr. Cason's report constitutes substantial evidence sufficient to support the RFC. *See Hacker*, 459 F.3d at 937.

Plaintiff also objects to the ALJ's reliance on Dr. Cason's report and opinions asserting that they were not work-related, and that the ALJ improperly relied upon the work-related findings in the report of the non-medical examiner in determining the RFC.

Although an ALJ may consider non-medical evidence in making the RFC

23

determination, the RFC must be supported by some medical evidence that addresses the claimant's ability to function in the workplace. *See Hutsell*, 259 F.3d at 712; *Lauer*, 245 F.3d at 704. The absence of an explicit reference to "work" in close proximity to the description of the claimant's medically evaluated limitations does not make it impossible for the ALJ to ascertain the claimant's work-related limitations from that evaluation. *Cox v. Astrue*, 495 F.3d 614, 620 n.6 (8th Cir. 2007). Such explicit language is unnecessary where the medical evaluation describes the claimant's functional limitations "with sufficient generalized clarity to allow for an understanding of how those limitations function in a work environment." *Id.*; *see also Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir. 2008).

Here, Dr. Cason's consultative medical evaluation is not limited to diagnostic or laboratory test results, but describes Plaintiff's functional limitations with "sufficient generalized clarity" to permit an understanding of Plaintiff's ability to function in a work environment. *Cox*, 495 F.3d at 620 n.6. Recognizing the MRI evidence of arthritis in Plaintiff's lumbar spine, Dr. Cason assessed the range of motion in her back and knees and elbow, finding it "normal" and "decreased," and "reduced" respectively; and reported that Plaintiff had slight tenderness in her back, but no muscle spasm; was able to touch her toes with straightened knees; and squat while holding onto the edge of a desk. (Tr. 171-73.) On the basis of these findings, the Court concludes that the ALJ properly relied upon the report and opinion of the medical examiner, Dr. Cason.

Plaintiff further argues that the ALJ improperly drew medical inferences from the

record because he made judgments based on a lack of expected findings, and relied upon the report of the non-medical single decision maker. "An ALJ may not draw upon his own inferences from medical reports" in making his RFC determination. *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). Nor may an ALJ rely exclusively upon medical inferences from the reports of non-medical sources in determining RFC. *Hutsell*, 259 F.3d at 707.

In this case, however, the ALJ did not base the RFC upon the absence of expected findings or exclusively upon the report of the non-medical consultant. The ALJ derived the RFC from substantial evidence on the record as a whole including, the results of clinical diagnostic test such as the Plaintiff's MRI; the opinions of treating and examining physicians; Dr. Cason's report and findings, some of which were consistent with Dr. Spezia's cursory treatment notes; evidence of Plaintiff's testimony and her daily activities showing she could perform a range of sedentary work.[11]

The ALJ also properly discredited Plaintiff's subjective complaints of impairment and pain. He did not, and was not required to discuss every *Polaski* factor he considered in doing so, but here the ALJ took into account several important indicia of credibility and found them lacking. *Dunahoo*, 241 F.3d at 1038. The ALJ took into account Plaintiff's sporadic work history, and the fact that she left the workplace for reasons unrelated to her alleged impairments. The ALJ also noted that Plaintiff's self-reported

---

[11] For example, in her Function Report, Plaintiff indicated that her condition affected her ability to lift, walk, climb, bend and stand, but did not affect her ability to sit. (Tr. 122).

daily activities were inconsistent with the degree of impairment she alleged. Specifically, he noted that Plaintiff was able to care for herself and six minor children; cook; perform household chores; do laundry; and "drive, shop, spend time with others, play cards, go to the movies, maintain attention, follow, instructions, and mange her own finances." (Tr. 13.) On the basis of this substantial evidence, the Court concludes that the ALJ appropriately found Plaintiff's subjective complaints lacking in credibility. *Teague*, 638 F.3d at 615.

In addition, on the record before it the Court cannot conclude that the ALJ improperly relied on the report of the non-medical consultant because the RFC differs from the findings of the non-medical consultant in numerous substantial respects and is based upon those portions of Plaintiff's testimony regarding her own activities that the ALJ found credible.

## VE Testimony and the Step Five Determination

Plaintiff further asserts that having reached step five of the sequential disability evaluation, the ALJ improperly determined that Plaintiff could perform work other than her prior relevant work. Plaintiff first asserts that the second hypothetical posed by the ALJ, upon which he ultimately relied for his step five determination, was not based upon substantial evidence because it took into account certain findings from the non-medical consultant's opinion.

The Court does not agree. In making the challenged determination, the ALJ presented the VE with the limitations he recognized in his RFC determination including

those impairments which the ALJ found credible and supported by substantial evidence on the record as a whole. A VE's response to a hypothetical question that sets forth those impairments supported by substantial evidence in the record and accepted as true by the ALJ is sufficient to satisfy the Commissioner's burden at step five. *Hunt v. Massanari*, 250 F.3d at 625.

In this case, the hypothetical took into account the limitations recognized by the ALJ in his RFC, including certain factors recognized by the non-medical consultant. However, none of the factors included in the hypothetical derived solely from the non-medical consultant's report. Each limitation included in the hypothetical was based upon substantial evidence and was therefore a proper basis for a hypothetical question and a determination at step five. That evidence showed Plaintiff could perform a range of sedentary work, and those limitations were accurately captured in the hypothetical considered by the vocational expert. (Tr. 10, 13-14, 30-32.)

Plaintiff also objects to the VE's response to the second hypothetical question as conflicting with SSR 96-9p. The second hypothetical included the limitation that Plaintiff "could never stoop," and Plaintiff asserts that the SSR 96-9p provides that a complete inability to stoop so diminishes the sedentary occupational base for unskilled work that a finding of "disabled" is required if an individual is unable to stoop.

This contention is without merit. SSR 96-9p does not mandate a finding of disability when a claimant cannot stoop. Instead, the agency ruling provides that a finding of disability may be appropriate if the claimant cannot stoop, but that the ALJ

should consult with the VE to determine the effect that an inability to stoop will have on the jobs identified by the VE. *See* SSR96-9p, 1996 WL 374185, at *8.

Here the ALJ explicitly included the inability to stoop in a separate hypothetical posed to the VE. The VE concluded that the previously identified jobs, cosmetics assembler, medical supplies packer, and table worker, would still be suitable for an individual who could not stoop. This response is corroborated by the description of these positions in the Dictionary of Occupational Titles ("DOT"). *See* DOT codes 739.687-066 (cosmetics assembler), 559.687-014 (medical supplies packer), and 739.687- 182 (table worker). In addition, the VE explicitly stated that his testimony was consistent with the DOT. (Tr. 32). Therefore, the Plaintiff's inability to stoop was appropriately addressed in accordance with SSR96-9p.

Plaintiff also asserts that in his hypothetical the ALJ failed to include Plaintiff's need to alternate between sitting and standing and the amount of time she needed to stand in an eight-hour day. Upon review of the transcript, the Court finds that the ALJ recognized these limitations by explaining to the VE that the hypothetical claimant could perform only sedentary work, and needed to rotate positions frequently. (Tr. 31.)

As defined by the Commissioner's regulations and used in the DOT, the terms, "sedentary work," and "frequently" have specified meanings,[12] and the VE testified that his testimony was consistent with the DOT. (Tr. 32.) Therefore, the Court concludes

---

[12] As defined by the Commissioner' regulations, "sedentary work" means sitting most of the time and may also involve walking or standing; "frequently," means occurring from one-third to two-thirds of the time. *See* SSR 83-10, 1983 WL 31251, at * 5-6.

that the use of the terms "sedentary" and "frequently" in the hypothetical were sufficient to apprise the VE of the specific limitations intended by the ALJ. *See* SSR 00-4p, 2000 WL 1898704, at *3; DOT Appendix C, 1991 WL 688702.

## CONCLUSION

In accordance with applicable statutes and regulations, Plaintiff had a fair hearing and full administrative consideration of her applications for disability insurance benefits and SSI, under Titles II and XVI of the Social Security Act, respectively, 42 U.S.C. §§401-434 and §§1381-1383(f). Substantial evidence on the record as a whole supports the Commissioner's decision regarding Plaintiff's application.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED.**

A separate Judgment shall accompany this Memorandum and Order.

AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 19th day of March, 2011